Ime Archibong **ETUK**, et al., Plaintiffs,

v.

J. Scott **BLACKMAN**, et al., Defendants.

No. 89 C 3265.

United States District Court, E.D. New York.

Sept. 27, 1990.

---

**3.** *See* note 2, *supra.*

Legal Aid Soc., New York City (Kathleen A. Masters, Margaret H. McDowell, Manuel D. Vargas, of counsel), for plaintiffs.

Andrew J. Maloney, U.S. Atty., Brooklyn, N.Y. (Scott Dunn, Sp. Asst. U.S. Atty., of counsel), for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

Plaintiffs, aliens permanently resident in the United States, bring this class action

for declaratory and injunctive relief alleging that defendants, officials of the Immigration and Naturalization Service (herein collectively "INS"), in withholding from them permanent resident cards or adequate replacements, are violating plaintiffs' rights under federal law and the United States Constitution. Plaintiffs move for class certification and for summary judgment, and INS crossmoves for summary judgment.

*Background*

The court finds most of the critical material facts not in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Under the Immigration and Nationality Act, certain aliens may be admitted to reside permanently in the United States, namely, those (a) who have as close relatives citizens or permanent United States residents, (b) who are refugees or asylees, or (c) who have skills or labor needed by United States employers. *See* 8 U.S.C. §§ 1153, 1101(a)(20).

Such lawful permanent residents receive a permanent residence card, known officially as the alien registration receipt card, (Form I-151 or the more recent Form I-551), colloquially the "green card" though recent versions have appeared in other colors. The card includes the alien's photograph, fingerprint, date of birth, date of admission to the United States, and alien registration number. Cards issued prior to 1989 bear no expiry date, while cards issued since 1989 must be replaced every ten years. *See* U.S. Department of Justice Immigration and Naturalization Service, Handbook for Employers, "Notice to Employers" addendum (1989) [hereinafter Handbook for Employers]. Permanent residents who receive a card as children must replace it once they reach age 14. 8 C.F.R. § 264.1(f).

Permanent resident aliens must carry the card on their persons at all times. Failure to do so is a misdemeanor carrying a maximum penalty of a $100 fine or 30 days imprisonment or both. 8 U.S.C. § 1304(e). Holders may use the card as required proof of their lawful permanent residence status for a variety of government assistance programs, among them food stamps, housing assistance programs, unemployment compensation, Aid to Families with Dependent Children, Medicaid, and Title IV educational assistance. *See* Pub.L. No. 99-603, § 121(a)(2), 100 Stat. 3359, 3386-88 (1986) (amending 42 U.S.C. § 1436a), § 121(a)(3), 100 Stat. 3359, 3380-90 (amending 20 U.S.C. § 1091).

They may also use the card as an entry document in lieu of a visa when returning to the United States after an absence of less than a year, 8 C.F.R. § 211.1(b). Green cards also serve to procure for lawful permanent individuals other important forms of identification, such as social security cards or drivers licenses.

A critical use of the green card arose with the enactment of the Immigration Reform and Control Act of 1986 ("the Reform and Control Act"), 8 U.S.C. §§ 1255a, 1324a, 1324b, Pub.L. No. 99-603, 100 Stat. 3359 (Nov. 6, 1986). That act prohibits the hiring or continued employment in the United States of any non-citizen who is neither a lawful permanent resident nor an alien granted employment authorization by the Attorney General. 8 U.S.C. §§ 1324a(a), 1324a(h)(3). Employers who violate the act are subject to civil fines and criminal penalties. *See* 8 U.S.C. §§ 1324a(f) and (e)(4).

Employers must attest they have verified their employees' identity and employment eligibility by examining one or a combination of specified documents. 8 U.S.C. § 1324a(b)(1)(A). The green card is one of those documents. 8 U.S.C. § 1324a(b)(1)(B)(v). This verification must take place within the employee's first three days on the job, 8 C.F.R. § 274a.2(b)(ii). But an employee unable to produce the necessary documents in that time may instead present a receipt for the application for them. The employee must then produce the documents within 21 business days of being hired. 8 C.F.R. § 274a(b)(vi).

Plaintiffs object in general to the INS policy for (1) replacing lost green cards and for (2) confiscating or withholding replacement cards from lawful permanent resi-

dents in deportation or exclusion proceedings. Plaintiffs claim that INS's withholding the cards, or delay in replacing lost cards without providing adequate substitutes in the interim, deprive them of their ability to obtain employment, and burden other rights and entitlements. Plaintiffs say this violates the due process clause of the Fifth Amendment, the Reform and Control Act, INS regulations, and the Administrative Procedures Act.

*The Policies in Question*

To replace a green card a permanent resident must file an application on INS Form I–90. 8 C.F.R. § 264.1(c)(2). According to defendants, INS then sends the applicant a "call-in" notice requesting the applicant to come into the INS New York District Office at a date the INS claims is "usually" within three weeks of INS' receipt of the application. The New York office provides an applicant who appears with a "Temporary I–551" to use during the three months or more it takes to replace the permanent I–551 card.

The INS Operating Instructions provide that temporary documents shall be issued "[w]hen such action is clearly warranted because of an emergency." Operating Instruction 264.2. Plaintiffs assert that INS sometimes fails to provide any temporary documents, and takes much longer than three months to replace green cards.

INS has a policy of confiscating the green card of permanent residents returning from abroad, who are placed in exclusion proceedings and are paroled into but not "admitted" into the United States. The INS does not return the card until the conclusion of the exclusion proceeding. When this lawsuit commenced, INS allegedly did not provide these permanent residents in exclusion proceedings with any replacement or substitute identification for the cards it confiscated and did not provide replacement or substitute identification to permanent residents in deportation proceedings who had lost their cards.

On March 14, 1990, in response to the institution of this lawsuit, the Commissioner of the INS, Gene McNary, issued a memorandum in "clarification" of INS policy. The memorandum provides that under certain circumstances INS agents may confiscate the green cards from lawful permanent residents in deportation or exclusion proceedings, and provide temporary substitute documents.

In the case of permanent residents returning from abroad, the McNary memorandum states that those who do not appear to the examining officer to be "clearly and beyond a doubt" admissible to the United States shall have their green cards "lifted". If they are paroled into the United States pending completion of exclusion proceedings, the INS shall provide them with a form bearing the legend:

> Returning resident applicant at _____ (port) on _____ (date). Paroled pending determination of right to reenter. Employment authorized.

The Acting District Director of the INS New York District Office states that such aliens will also be issued a Form I–688B. This is a laminated card with the alien's photograph, a date of expiration, and a legend on the back stating that the person identified is authorized for employment during the term of the card and that the card is not evidence of permanent residence in the United States. None of the plaintiffs has been issued a Form I–688B.

With respect to aliens in deportation proceedings the McNary memorandum directs:

> If the district director, chief patrol agent or officer in charge determines that a temporary document is needed to assure the alien's appearance at hearings, or for other justifiable reasons, the laminated Form I–151 or I–551 will be lifted, and a temporary I–551 issued. In these cases, temporary Forms I–551 will be prepared in accordance with the guidance in O.I. 264.2, and will be issued for a period sufficient to allow completion of the deportation proceedings, but in no case less than six months.

Operating Instruction 264.2 provides for the issuance of a temporary substitute for the green card of the same type issued lawful permanent residents awaiting replacement cards.

Although this instruction clearly permits the "lifting" or confiscation of green cards, the INS New York District Office Director states that it is not nor has it been INS policy to confiscate green cards from lawful permanent residents in deportation proceedings unless they are in detention. Plaintiffs allege, and defendants do not dispute, that the INS will not replace the lost cards of permanent residents in deportation proceedings unless there is a decision favorable to the permanent resident.

*Justiciability*

■ INS argues that the new policies set forth in the McNary memorandum make this action either moot or unripe for review, because the district offices may or may not comply with this recently issued directive.

This argument has no merit. The McNary memorandum addresses neither the three month delay plaintiffs allege that permanent residents encounter in receiving replacement green cards, nor the "usual" three week delay between the time of their application for a replacement and their receipt of a "Temporary I-551" stamp. Where the issue is unreasonable delay in providing an entitlement, claims will often fall into the category of those "capable of repetition yet evading review." *See Andujar v. Weinberger*, 69 F.R.D. 690, 696 n. 6 (S.D.N.Y.1976) (quoting *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)).

■ Moreover, the claims of INS failure to provide any sort of substitute proof of employment authorization are not moot. A voluntary cessation of allegedly illegal conduct does not deprive the court of the power to hear and determine the case. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953). INS' conduct in denying some of the named plaintiffs substitute identification documents for years, and then changing its policy by memorandum under pressure of this litigation does not convince the court that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *City of*

*Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 1074–75, 71 L.Ed.2d 152 (1982).

Moreover, the complaint alleges that the temporary proofs of employment authorization the INS provides are not "adequate." If those proofs are still inadequate, this claim is not moot. Fed.R.Civ.P. 15(b).

*The Plaintiff Class*

■ Plaintiffs move to certify this as a class action under Federal Rule of Civil Procedure 23(b)(2), as one where "the party opposing the class has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole".

The class plaintiffs wish to represent is that of all lawful permanent residents within the jurisdiction of the New York District of the INS whose permanent resident cards either have been or will be confiscated or retained by the INS, or whose cards have been or will be otherwise lost, but to whom the INS fails to provide replacement cards within a reasonable time or to provide adequate, interim proof of lawful permanent resident status and employment authorization. Under Federal Rule of Civil Procedure 23(a) the plaintiffs must satisfy four preconditions for class certification, namely:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The plaintiff class straddles two distinct groups of permanent resident aliens: those who have lost their green cards and are awaiting replacements, and those who have had them confiscated by the INS at the border in anticipation of exclusion hearings. As the court explains below, different questions of law and fact arise regarding the claims of these two groups. The court, for the moment, confines its discus-

sion to those lawful permanent residents who have lost their green cards in some manner other than confiscation by the INS at the border preliminary to an exclusion hearing.

The members of the class of persons who have lost cards are plainly too numerous to join practicably. Between 1978 and 1988, over 900,000 persons were admitted to the United States as lawful permanent residents intending to reside in New York State. Over 50,000 persons applied to the INS New York District office for replacement green cards in the period from October 1988 to September 1989. The difficulty in estimating the numbers of this class underscores the impracticability of joinder. The class here is fluid in composition, as permanent residents lose or regain their cards, yet the nature of the harm alleged is constant. *See Bruce v. Christian*, 113 F.R.D. 554 (S.D.N.Y.1986).

Though different sets of circumstances and policies have deprived these plaintiffs of their green cards, their purported injury is the same, and their claims rest on common questions regarding the legality of these policies. *See Andujar v. Weinberger*, 69 F.R.D. 690, 696 n. 6 (S.D.N.Y. 1976) and *Jones v. Bowen*, 121 F.R.D. 344, 349 (N.D.Ill.1988). The named plaintiffs together present claims that are typical of those of the class. They arise from the same policies which they challenged on the same constitutional and statutory grounds. *Id.*

The representation by counsel from the Immigration Law Unit of the Legal Aid Society appears fairly and adequately to protect the interests of the class. The interests of the named plaintiffs in no way appear to be adverse to each other or to the class. *See Malchmam v. Davis*, 706 F.2d 426 (2d Cir.1983).

INS' chief objection to class certification is that the plaintiffs lack standing because their claims are as to policies alleged to exist prior to the McNary memorandum. INS says it now provides all potential plaintiffs brought to their attention either "Temporary I–551" forms or "call-in" letters to receive such documents.

However, as detailed above, plaintiffs claim not only the complete deprivation of any document proving their status and employment authorization but an inadequacy in the substitutes provided and delays in receiving either their green cards or adequate substitutes. The one plaintiff who regained her green card had to go without any substitute for four and one half months.

■ Moreover, even were the court to accept INS' assertion that plaintiffs' objections are to policies and practices expunged by the McNary memorandum, the court finds that the abrupt issuance of this memorandum only in the face of litigation gives no assurance that the plaintiffs will not become "involved in the same controversy in the future" should another abrupt shift in policy occur at the conclusion of this action. *United States Parole Commission v. Geraghty*, 445 U.S. 388, 398, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980). Where the claim is capable of repetition, yet evading review, a named plaintiff may litigate the interests of the class despite losing his or her personal stake in the outcome of the litigation. *Id.*

## Replacement of Cards

### A.

■ The court first considers whether defendants' policies regarding the replacement of lost green cards violates the Immigration Reform and Control Act amendments to the Immigration and Nationality Act, or the regulations adopted under it.

■ The Executive branch derives its authority over immigration matters from the inherent power over foreign relations and statutory grants of authority from Congress. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950). In this case, INS argues that the policies at issue concern the effective enforcement of immigration laws. "[T]he Attorney General acts in his presumptively Article II capacity when he administers the Immigration and Nationality Act," and in those circumstances, executive action "is always subject to check

by the terms of the legislation that authorized it, and if that authority is exceeded it is open to judicial review." *INS v. Chadha*, 462 U.S. 919, 954 n. 16, 103 S.Ct. 2764, 2785 n. 16, 77 L.Ed.2d 317 (1983).

■ Congress has delegated to the Attorney General broad power to act to enforce all laws relating to immigration and naturalization, 8 U.S.C. § 1103. He in turn has delegated this power to the INS Commissioner, 8 C.F.R. § 100.2. The scope of review of the Attorney General's exercise of discretion is narrow, restricted to whether it is based on a facially legitimate and bona fide reason, *Kleindienst v. Mandel*, 408 U.S. 753, 770, 92 S.Ct. 2576, 2585–86, 33 L.Ed.2d 683 (1972), rather than on a departure "without rational explanation from established policies," *Bertrand v. Sava*, 684 F.2d 204, 212 (2d Cir.1982).

### B.

The Supreme Court has recognized that "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity" secured by the due process clause for aliens as well as citizens against official deprivation. *Truax v. Raich*, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915). Permanent resident aliens have not only a right to work but an obligation to support themselves. Should they become public charges, they may be subject to deportation. 8 U.S.C. §§ 1251(a)(1), 1182(a)(15).

The House Committee Report on the Reform and Control Act explicitly recognized both this right and this obligation. The committee did "not believe barriers should be placed in the path of permanent residents and other aliens who are authorized to work and who are seeking employment, particularly when such aliens have evidenced an intent to become U.S. citizens." H.R.Rep. No. 682, 99th Cong., 2d Sess. 1, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5649, 5673–74.

To that end, the Reform and Control Act included provisions making it illegal for employers to discriminate based on national origin or citizenship status. The Committee conceived these provisions as a deterrent to unwarranted discrimination by employers made over-cautious by the statutory sanctions against employing unauthorized aliens. *See* H.R.Rep. No. 682, 99th Cong., 2d Sess. 68, *reprinted in* 1986 U.S. Code Cong. & Admin.News 5672; H.R. Conf.Rep. No. 1000, 2d Sess. 87, *reprinted in* 1986 U.S.Code & Admin.News 5840, 5841–43. Should Congress terminate the employer sanctions provisions of the Act, the anti-discrimination provisions will expire as well. 8 U.S.C. § 1324b(k).

The Reform and Control Act prohibits the employment of "unauthorized aliens," which it defines as aliens who are neither "(A) ... lawfully admitted for permanent residence [n]or (B) authorized to be so employed by this chapter or by the Attorney General." 8 U.S.C. § 1324a(h)(3). The use of the disjunctive underscores the fact that permanent resident status is enough for employment eligibility; authorization is not necessary.

Accordingly, the implementing INS regulations list lawful permanent residents as one of the classes of aliens "authorized to be employed in the United States without restrictions as to location or type of employment as a condition of their admission or subsequent change to one of the indicated classes, and *specific employment authorization need not be requested.*" 8 C.F.R. § 274a.12(a)(1) (emphasis added). The Act explicitly exempts lawful permanent residents from the requirement that documentation of employment authorization "conspicuously" state any limitations with respect to the period or type of employment or employer. 8 U.S.C. § 1324a(h)(1).

Although the Act contemplates that lawful permanent residents will use their "resident alien" cards to satisfy the verification requirements, other documents will also suffice. An unexpired foreign passport carrying "an appropriate, unexpired endorsement of the Attorney General" authorizing employment will prove both identity and employment eligibility. 8 U.S.C. § 1324a(b)(1)(B).

The Reform and Control Act also permits employees to proffer a proof of identification, such as a driver's license or a school identification card, in combination with a proof of employment eligibility, such as a social security card, a refugee travel document, or an INS employment authorization. 8 U.S.C. § 1324a(b)(1)(B). Employers may not specify which of these acceptable documents or combinations of documents the employee must produce. *See* 8 U.S.C. § 1324a(b)(1)(A) and U.S. Department of Justice Immigration and Naturalization Service Handbook for Employers 8 (1987).

Plaintiffs argue that as a practical matter many lawful permanent residents who have lived in the United States for a substantial time will no longer have unexpired foreign passports. Indeed, four of the five named plaintiffs have resided in this country over a decade. They have submitted anecdotal evidence tending to show that to obtain a new passport from their embassy or consulate can be a lengthy and difficult process, particularly when they must produce foreign documents such as original birth certificates.

Plaintiffs also submit evidence that they have found it difficult or impossible to obtain other forms of identification acceptable under the Act, such as a drivers license or a social security card. The relevant agencies require proof of lawful permanent residence status in the form of a green card. Plaintiffs argue that the green card is the only document that all permanent residents can rely on as proof of their status.

INS disputes that plaintiffs are unable to obtain social security cards with the temporary substitute documents it provides them. The pertinent internal Social Security Administration policies are unclear, stipulating that all applicants alleging permanent residence status "must" show a green card, RM 00203.155, but also listing the "temporary I-551" under the heading for "Evidence of Status as Alien Admitted for Temporary Purposes". RM 00203.160. INS offers no evidence that suggests the process of obtaining a social security card is any less fraught with delay, difficulty,

and bureaucratic confusion than plaintiffs' affidavits attest.

The court need not resolve the question of whether the "temporary I-551" is adequate to procure a social security card. The INS and not the Social Security Administration is responsible for implementing immigration laws and providing the requisite documents for aliens to demonstrate their eligibility for employment. Indeed, the Congressional Committee deleted a provision requiring the verification of job applicants' social security numbers. *See* H.R. No. 682(III), 99th Cong., 2d Sess. 1, 7–8, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5791, 5792–93.

The INS argument that lawful permanent residents have no right to a green card is inconsistent with the legislation making it the Attorney General's duty to provide green cards, "in such form and manner and at such time as shall be prescribed under regulations" issued by him, 8 U.S.C. § 1304(d), and requiring lawful permanent residents to have the cards in their personal possession. *See* 8 U.S.C. § 1304(e).

It is true that when the 1940 Alien Registration Act was enacted, its purpose was to allow the government to identify aliens, rather than to enable aliens to identify themselves. *See United States v. Franklin*, 188 F.2d 182, 187 (7th Cir.1951). But the requirement that permanent residents be issued and carry registration cards was part of the statutory universe in which the Reform and Control Act was framed in 1986. That act plainly contemplates that lawful permanent residents do not have to apply for employment authorization from the Attorney General. They are already so authorized by virtue of their status, and presumably already provided with a document attesting to that status.

■ It follows that under the Reform and Control Act, permanent resident aliens who lose their green cards are entitled to some other means of proving their status within the time periods provided by INS regulations. Were a lawful permanent resident alien on the day of hire to lose a wallet containing the green card and that

day apply for a replacement, the INS is required to provide within 21 business days or less a document proving that resident's status.

Such proof does not have to be the laminated I–551 "green" card (now pink and blue). The Reform and Control Act specifies, however, that an acceptable "resident alien card" or "alien registration card" must contain:

(I) a photograph of the individual or such other personal identifying information relating to the individual as the Attorney General finds, by regulation, sufficient for purposes of this subsection, and

(II) [be] evidence of authorization of employment in the United States.

8 U.S.C. § 1324a(b)(1)(B)(v). The green card fulfills these requirements. INS contends that the "Temporary I–551" fulfills them as well.

The "Temporary I–551" consists of a stamp with the following legend:

PROCESSED FOR I–551. TEMPORARY EVIDENCE OF LAWFUL ADMISSION FOR PERMANENT RESIDENCE VALID UNTIL _____. EMPLOYMENT AUTHORIZED.

This stamp is placed either in the applicant's unexpired foreign passport or on the front of an I–94 form, *see* INS Operations Instructions 264.2, described by INS in its Handbook for Employers as an "arrival-departure record issued ... to nonimmigrant aliens." Handbook for Employers, p. 13.

The front of the Form I–94 contains the applicant's name, date of birth, alien registration number, and country of citizenship, as well as an admission number and the legend "Form I–94 Departure Record." The admission number should be covered over by the lawful permanent resident's photograph when the form is used as a "Temporary I–551", INS Operating Instruction 264.2, although some versions issued to members of the plaintiff class do not contain a photograph.

The front of the I–94, when so stamped, with a photograph obscuring the words "Departure Record", would satisfy the statutory requirements for an "alien registration card" or "resident alien card." 8

U.S.C. § 1324a(b)(1)(B)(v). A concern for fraudulent green card applications is a rational basis for limiting the card's validity to the interim period while INS processes and verifies applications.

However, the following statements printed on the back of the form render it unacceptably misleading:

**Warning** A nonimmigrant who accepts unauthorized employment is subject to deportation.

. . . .

You are authorized to stay in the U.S. only until the date written on this form. To remain past this date, without permission from immigration authorities, is a violation of the law. **Surrender this permit when you leave the U.S.**

(boldface in original). This text, which the samples in the record show as more legible than the "Temporary I–551" stamp, suggests that the bearer of the card is not a lawful permanent resident and is authorized for employment for only a limited period of time. In fact, the date on the card refers only to the expiration of the "Temporary I–551" and not to any expiration in the permanent resident's status or entitlement to remain in the country and work. The Form I–688B, which INS claims is also given as a substitute card, presents similar problems as it authorizes the holder only until its expiry date and declares itself "not evidence of permanent residence in the United States."

The hardship this works on lawful permanent residents is twofold. First, employers can rationally assume that the bearer of this card is available or employable only for the limited time stamped on the front. In fact the bearer resides permanently in this country and is eligible for work so long as permanent resident status remains unchanged. The quoted statements on the form might not deter every employer from hiring the bearer. But in all likelihood they limit the bearer to short-term job opportunities.

Second, persons who offer this card claiming they are permanent residents could reasonably cause an employer to

doubt either their words or the card's authenticity. Employers are required to verify that they have inspected a document which "reasonably appears on its face to be genuine." 8 U.S.C. § 1324a(b)(1)(A). The INS interprets this to impose a duty physically to inspect "and ensure that the documents presented appear to be genuine and to relate to the individual." 8 C.F.R. § 274a.2(b).

Employers incur liability under the Act should they "knowingly" employ an unauthorized alien. Immigration judges have interpreted the scienter requirement to be constructive knowledge, that is, what a reasonable and prudent employer should know. *See, e.g., United States v. Collins Food International, Inc.,* No. 89100084, slip op. at 13 (U.S. Dep't of Justice Executive Office for Immigration Review OCA-HO, Jan. 9, 1989) (employer liable for hiring unauthorized alien whose name was misspelled on Social Security card, which bore other indicia of inauthenticity); *see also United States v. New El Rey Sausage Co.,* No. 88100080 (OCAHO July 7, 1989) (where employer had information that would lead a reasonable person to doubt eligibility of applicant, employer liable to sanction); *cf. In re Charge of Rosita Martinez, United States v. Marcel Watch Corp.,* No. 89200085 (OCAHO March 22, 1990) (employer's unreasonable refusal to accept birth certificate of Puerto Rican citizen no defense to discrimination charge).

A prudent and rational employer might well suspect that a document warning the bearer to leave the country by a certain date is not genuine or does not relate to someone with the status of a permanent resident. Should the permanent resident file a discrimination charge against the employer for refusing these proofs of employment eligibility, the employer could plausibly assert as a defense that the reason for refusing to employ the applicant was that the applicant offered documents appearing suspect. To hold that either the I-94 or the I-688B form is an acceptable proof for lawful permanent residents of their status would tend to vitiate the anti-discrimination provisions of the Reform and Control Act, and to contravene that act's purpose not to "place barriers" in the path of permanent residents seeking employment.

The confusion these temporary substitutes cause is not merely hypothetical. A task force appointed by the Governor of New York State to study the effect of the Reform and Control Act reported that 51% of the firms sampled reported they would not know how to determine if an unfamiliar form of work authorization document was acceptable under the law. New York State Inter-Agency Task Force on Immigration Affairs, Immigration in New York State: Impact and Issues 18 (February 23, 1990). According to the same report, 13% of employers reported policies that prevent persons with temporary work authorization from obtaining employment. *Id.* at 17. The General Accounting Office reported to Congress similar figures for New York City. *See* GAO Immigration Reform: Employer Sanctions and the Question of Discrimination 43 (March 29, 1990).

Members of the plaintiff class have submitted affidavits attesting to their difficulties in finding employers who would accept the temporary documents as proof of employment authorization and lawful permanent resident status.

The court concludes that INS policy and practice is not within its statutory grant of authority. The Reform and Control Act and the INS's published regulations mandate that permanent residents who apply for replacement green cards be provided a suitable temporary substitute document in no later than 21 business days, inclusive of the day of application.

A suitable temporary substitute must comply with the requirements of 8 U.S.C. § 1324a(b)(1)(B)(v), and contain no information that casts doubt on the bearer's status as a lawful permanent resident.

The INS may submit to the court, on notice to plaintiffs, the language it proposes to use on the document. It should be designed so that an employer of ordinary care and prudence would find it a "genuine" proof of lawful permanent resident status that "related to" the individual to whom it is issued.

Having decided that INS policies and practices regarding the replacement of green cards for lawful permanent residents are invalid under the applicable legislation, the court does not reach the constitutional issue or the issue of validity of these policies under the Administrative Procedures Act.

### Confiscation of Cards

#### A.

■ The INS argues that confiscating the green cards of permanent residents in deportation or exclusion proceedings serves various purposes. The two most relevant are (1) to ensure that the cardholder appears at the immigration proceeding; (2) to ensure that aliens ordered deported or excluded do not use their green cards to continue to live in or re-enter the United States. This action does not assert a right to retain cards on behalf of aliens who withdraw their applications for admission to the United States or of aliens who by regulation must replace outdated cards. Thus the court does not consider INS' other rationales.

Congress has conferred on the Attorney General and the INS broad power to act to enforce all laws relating to immigration and naturalization, 8 U.S.C. § 1103, including the power to inspect aliens, § 1225, to parole aliens under such conditions it may prescribe, § 1182, and to interrogate, arrest and deport aliens illegally in the United States, 8 U.S.C. §§ 1357(a)(1), (a)(2) and 1252.

The policy of confiscating green cards is rationally related to the INS's statutory mandate to enforce these laws. The card is a valuable aid to aliens who seek to evade enforcement of United States law and remain and work in this country. Possession of a green card with no expiry date, or a date far in the future, is a disincentive to comply with a deportation or exclusion order, or even to appear at deportation and exclusion proceedings when an adverse decision and confiscation of the card is anticipated.

This conclusion, however, does not alter the agency's statutory duty to provide a temporary substitute proof of status to "lawfully admitted permanent residents" whose cards are confiscated. Permanent residents do not lose the benefits of their status until the entry of a final administrative order of deportation. *See Matter of Duarte*, 18 I & N Dec. 329 (BIA 1982) and *Matter of Lok*, 18 I & N Dec. 101 (BIA 1981).

For the reasons already stated, the temporary documents now offered by the INS do not qualify as adequate proof of lawful permanent status.

As noted above, permanent residents in deportation proceedings are nevertheless "lawfully admitted for permanent residence" within the meaning of 8 U.S.C. § 1324a(h)(3) until a final administrative order changes their status. As lawful permanent residents they are entitled to documents that appear both genuine and related to them. Though they may in the future be deported, they have the benefit of the anti-discrimination provisions protecting both citizens and "intending citizens." 8 U.S.C. § 1324b(a)(3). The legislation makes no distinction between permanent residents in deportation proceedings, which may stretch over a period of years, and other permanent residents. It merely requires permanent residents to complete a "declaration of intention to become a citizen," timely apply for naturalization, and be naturalized within two years of application. *Id.* "[T]ime consumed in the Service's processing the application" is exempted from the period within which they must be naturalized. *Id.* As deportation proceedings suspend INS consideration of naturalization proceedings, *see* 8 U.S.C. § 1429, the period of the deportation proceeding is presumably exempt.

As in the case of substitute documents for persons awaiting replacement green cards, the temporary cards issued to permanent residents in deportation proceedings must accurately reflect their status. Neither the Form I–94 nor the I–688B will accomplish this requirement. As detailed above, an acceptable temporary substitute must conform to the definition set forth in 8 U.S.C. § 1324a(b)(1)(B)(v).

It is not clear that permanent residents placed in exclusion proceedings and paroled into the country have been "lawfully admitted," and the parties have not addressed this question.

The act requires the Attorney General to provide conspicuous statements of any limitations with respect to period or type of employment on documents provided to aliens "other than" those "lawfully admitted for permanent residence." 8 U.S.C. § 1324a(h)(1). Since the briefs have not focused on whether those in exclusion proceedings and paroled into the United States are "lawfully admitted," the court will reserve decision on this issue pending receipt of further papers.

## B.

Plaintiffs argue that the policy of confiscating green cards announced in the McNary memorandum was adopted without publication of the policy in the Federal Register for notice and comment, in violation of the Administrative Procedure Act, 5 U.S.C. § 553. INS counters that the McNary memorandum constitutes a "general statement[ ] of policy" not subject to the notice and comment provisions under 5 U.S.C. § 553(b)(A).

Analysis of the "general statement of policy" exception has been likened to "wandering lost in the Serbonian Bog." *See Jean v. Nelson*, 711 F.2d 1455, 1480 (11th Cir.1983). The Administrative Procedure Act does not define the term. The courts have offered varying glosses, among them whether the rule has merely a prospective rather than an immediate and substantial impact upon those it regulates, or whether the rule primarily educates agency members or regulates the public. *See Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975). *But see Jean, supra* at 1480 (the more general the policy, the more substantial an impact it may have).

One theme running through these decisions is whether the policy is merely suggestive and unbinding on the agency in an individual case, or establishes a "binding norm" that is determinative of the issues or rights to which it is addressed. *Jean,*

*supra* at 1481–82. Where there is no opportunity for objection at the time of the rule's application, it is important there be an opportunity for comment prior to its promulgation. *Id.* On its face, the policy regarding permanent residents in deportation proceedings appears to admit some discretion. The McNary memorandum provides that if the immigration official "determines that a temporary document is needed to assure the alien's appearance at hearings, or for other justifiable reasons, the [card] will be lifted." The memorandum continues that "[i]n these cases, temporary Forms I–551 will be prepared in accordance with the guidance in Operating Instruction 264.2," which directs the use of the misleading arrival-departure Form I–94.

The court does not decide whether promulgation of the policy was in violation of the Administrative Procedure Act because the court has already determined that the INS may not confiscate green cards from permanent residents lawfully admitted without providing adequate temporary substitutes.

Such confiscation without providing them accurate temporary substitute identification documents has a "substantial impact" on those regulated. *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir.1975). By inhibiting employers from hiring them and impeding their access to legal employment this policy changes existing rights and obligations. *See Lewis–Mota v. Secretary of Labor*, 469 F.2d 478, 482 (2d Cir.1972).

In addition, the court does not now consider the due process claim. The courts should not reach constitutional questions where other grounds for decision exist. See *Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 2996–97, 86 L.Ed.2d 664 (1985) and cases cited.

*Conclusion*

The court reserves decision on the issues as to permanent residents placed in exclusion proceedings and paroled into the United States. The parties are directed to make further submissions to the court on

this issue within 30 days of the date of this order, with 15 days for reply papers.

Regarding all other permanent residents lawfully admitted to the United States, the court directs as follows. The motion for class certification for such permanent residents is granted. Plaintiffs' motion is granted to the extent that the court (1) declares that INS is obligated under the Immigration and Naturalization Act, the Immigration Reform and Control Act, and the published regulations to provide adequate temporary proof of status to all permanent resident aliens lawfully admitted to the United States who apply to replace their lost green cards, and (2) the confiscation of green cards of aliens in deportation proceedings without the provision of adequate temporary replacements is enjoined. The motion of INS for summary judgment is denied.

Submit order on notice.

So ordered.